# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF VERMONT.

---

BANKERS' LIFE INSURANCE COMPANY OF NEW YORK *v.*
FRED A. HOWLAND and JOHN L. BACON,
Insurance Commissioners.

October Term, 1900.

Present: TAFT, C. J., TYLER, MUNSON, START, WATSON and STAFFORD, JJ.

Opinion filed January 31, 1901.

*Life insurance—Valuation of policies providing for a preliminary one year term—V. S. 4178*—Under V. S. 4178 a foreign life insurance company issuing one year term policies with an option of renewal may, in computing its premium reserve, treat the first year's insurance under such policies as term insurance.

*Life insurance—Statutory requirements in respect to the computation of the premium reserve—V. S. 4178*—The right of a foreign life insurance company to value a policy by treating the first year's insurance as term rests upon the freedom allowed by the statute, which regulates the computation only in respect to the tables of mortality and the rate of interest to be employed.

*Life insurance—V. S. 4218—Discrimination between insurants—Insurants not of the same class*—A one year term policy with an option of renewal is not in its entirety the equivalent of a simple one year term policy, and the policy-holders are not insurants of the same class under V. S. 4218 forbidding discrimination between insurants of the same class.

*Mandamus when legal right is clear and there is no other adequate*
*remedy—Mandamus to insurance commissioners to grant a license*
*withheld through their legal error*—The writ of mandamus issues
on the petition of one who has a clear legal right and no other ade-
quate remedy.. It will issue to direct insurance commissioners to
grant to a foreign insurance company a license to which in com-
pliance with law it has shown itself entitled, and which has been
withheld in consequence of an erroneous ruling of the commission-
ers upon a question of law.

PETITION FOR MANDAMUS brought to the Supreme Court
for Washington County and heard on petition, answer, deposi-
tions and stipulations at the October Term, 1900.    The scope
of the testimony and of the matter referred to by stipulation
appears from the opinion.

B. F. *Fifield* and *Seneca Haselton* for the petitioner.

*Dillingham, Huse & Howland* and *John Young* for the
petitionees.

TAFT, C. J.    In February, 1900, the Bankers' Life Insur-
ance Company of New York applied to the Insurance Commis-
sioners of Vermont for a license to do business therein.    Such
license was refused and the Company bring their petition for
a mandamus to order and direct the commissioners to issue
such license.    A foreign joint stock life insurance company
cannot do business in this state unless it has paid up capital
invested in securities readily convertible into cash of at least
one hundred thousand dollars, not less than one-half of which
is invested in cash securities other than mortgages of real
estate; nor unless such company has, in addition to such cap-
ital, assets equal in amount to its outstanding liabilities, reck-
oning the premium reserve on its life risks based on the actu-
aries' tables of mortality, with interest at four per cent. as a
liability.    V. S. s. 4178    It cannot then transact business unless
it first obtains a license from the insurance commissioners,
authorizing it so to do.    Before receiving such license the

company shall file with the Secretary of State a certified copy of its charter and by-laws and a statement under oath, of its president and secretary, showing its financial condition and standing. V. S. s. 4181. If upon the filing of such copies and statement the commissioners are satisfied with them and further satisfied that the company has complied with the title relating to insurance, they shall grant a license authorizing it to do business, etc., and such license may be renewed annually so long as the company complies with the requirements aforesaid and the commissioners regard the company as safe and entitled to public confidence. V. S. s. 4182. Thus under our statutes a foreign life insurance company is entitled to do business in this state if it has the requisite capital, properly invested, and assets equal to its absolute liabilities, and the required premium reserve. Upon presentation of the petitioner's statement to the commissioners no question was made in respect to the capital stock of the petitioner, as it had the necessary amount invested in United States Government Bonds of the par value of $100,000.00, and according to its statement had assets equal to its capital stock, its absolute liabilities, like unadjusted death claims, etc., and its premium reserve. Upon this showing, the reserve being certified by the Insurance Department of New York, the petitioner was, upon the face of the statement, entitled to a license. But the petitionees contend that the petition should be dismissed. They claim that the computation of the reserve was erroneous, and was in fact so much larger than the amount shown by the statement, that there was a deficiency of assets under the requirements of our statutes. This depends upon the mode of computing the reserve upon the first year of the policies issued by the company; it is the disagreement upon this question that the parties wish determined by the court, and that is the only question in the case. It is claimed by the petitionees that the petition

should be dismissed for that the petitioner did not furnish them the amount of the premium reserve computed in the manner which the petitionees claim is the legal mode of calculating it. If the petitionees are correct in their claim as to the mode of valuation, the point would be well taken but if wrong, then that fact is immaterial, so that this point is involved in the main question and is determined by it, and the main question is, in what manner should the premium reserve be computed. A life insurance company is chargeable with what is called "a premium reserve" representing what it must have in hand to meet its ultimate liabilities upon its policies. Under our statutes it should have assets enough, at any time, which, invested at four per cent. interest, reckoning the lives of its policy holders by the actuaries' tables of mortality, together with the future premiums payable to it under its policies, will enable it to meet all policy obligations. What such obligations will ultimately prove to be, partakes of the nature of speculation, for a great part of the liabilities of any company are contingent. No one can foretell the time of death; mortality tables must be constructed, and some rate of interest taken, and with all calculations and estimates the result is not certain. The premium reserve is no test of a company's actual solvency. Mr. Elizur Wright, cited by the petitionees' counsel as "the father of the net reserve valuation system and the most distinguished exponent of the principles of state supervision of life insurance," says the net valuation system was originally incorporated into the law not as determinant of the actual solvency of a company, which it never can be, but to compel the company to conduct its business on the lines tacitly assumed in its contracts. Equity between the members, not actual solvency, was, according to Mr. Wright, the primary object of the law. Protection against insolvency was simply a result which would naturally follow its application.

While it is true that the valuation of a company's policies must rest substantially on the tables of mortality and the rate of interest, there are other matters proper to consider in determining the actual standing of a life insurance company. It is shown by the record that the expenses of a life insurance company in granting a policy absorb the greater part of the premium for the first year, substantially three-fourths or more of it, and that the expenses the first year of a policy are ten times greater than for any subsequent year. As a witness for the petitioner stated, they "practically absorb the greater part, perhaps nearly the whole of the first year's premium of the annual life policy." The record shows that of the companies doing business in this state in 1899, the largest, the Mutual Life of New York, reports that it paid 68 3-10 per cent. in commissions alone upon its first year premiums, all the companies average over 50 per cent., one company doing industrial business reports that it paid 100 per cent. cost of collection on new business, and still another that it paid 95.2 per cent. in commissions alone on its new business. No company can successfully do business unless it pays commissions as large as the leading companies in the country, and then is often at a disadvantage from being small. As the witness Stone stated "it is the larger companies that set the pace in such matters. Small companies have  *  *  *  *  to meet the competition or make no progress."

A new company to begin business and a small company to continue, in order to succeed, must pay "what companies in general pay." We quote Mr. Wright again, viz.: "New companies, planted within the shadow of flourishing old ones, cannot ·be expected to get into successful operation without expending on their machinery more than the premium receipts for one, two, or perhaps three, of the first years." Mass. Ins. Coms. Rep'ts. 1859-65, 115. The petitionees' testimony

shows that no company can organize and succeed without contributions from some source—gifts to it from either stockholders in case of a stock company, or, from the world at large in the case of a mutual company—and it is well to note that the largest companies in the world were organized as mutual companies. The supposition that philanthropists are to be found to make rich gifts to a life insurance company is too absurd to be entertained.

If a new company does pay the usual commissions upon its business one of the petitionees concedes that "the company when beginning would be at once insolvent, and there can be no dispute about it." The term solvency in this connection means a statutory one, viz. :—a compliance with the conditions upon which it is permitted to do business. Applying the rule of valuation contended for by the petitionees no new company, stock nor mutual, can organize and successfully begin business and no small company can so continue without becoming at once insolvent in a statutory sense. This is conceded by the commissioners. If a company could be born with a large surplus it might struggle for an existence, but without one its first attempt to breathe would be death. The visits of the midwife and the undertaker would be simultaneous and their different offices might be combined. A company like an individual, must first be an infant, and there is little hope of life when you smother it in its swaddling clothes.

Now what construction shall be given to the statute relating to the premium reserve? It should be construed liberally, for, as said by Mr. Wright, "Insurance seeks breadth of basis and cannot be safely cooped within narrow local limits—state laws tending to impose limits should be construed liberally and state officials especially should never. step beyond the law in the direction of exclusion." Mass. Ins. Coms. Rep'ts. 1859-65, 177.

The state has made no attempt to regulate the details of the insurance business save that the companies must use, in computing the reserve, the actuaries' tables of mortality, and the 4 per cent. rate of interest.  A net valuation is important in determining just what a company must have in hand as a matter of equity between the old and the new members, the past and the future.  If the standard is not correct, either the past or the future members are benefited at the expense of the other class.

The premium reserve is to be computed with reference to the life of the policies.  A policy may terminate in a year and may not in fourscore years.  Mr. Wright states in speaking of the premium reserve: "Solvency is not the only question * * * * there is a question of equity as well. * * * * The question is not how much of the past and present burden can be thrown on the future, but what will probably be as fair for one as the other."  This directly recognizes the principle that the rule may be varied in the direction contended for by the petitioner.  The same learned writer says that any company if it can get on "with expenses less than the excess of its actual over its net premiums, has a future resource against a present deficiency, and is not necessarily insolvent because its cash assets do not equal the net value of its policies,"—and further, "This provision or premium reserve may have a more or less important bearing on the ultimate solvency of the company according to the greater or less margin of the actual premiums."

The matter of expenses is a potent factor in determining the solvency or standing of a company.  As Mr. Wright says: "Neither the net value of the policies by itself nor the ratio of its cash assets to that net value decides the condition of the company without reference to the actual premiums receivable. * * * * Two companies by a net valuation of their pol-

icies may be found to have exactly equal liabilities, and their cash assets may be equal and yet their prospects for the future may be different from their having different actual premiums." Mass. Ins. Com. Rep'ts. 1859-1865, 179. Mr. Wells, actuary of the Conn. Mutual Life Ins. Co., one of the petitionees' two witnesses, in his testimony says: "If we have reference to the actual commercial solvency of the company rather than to the statutory legal solvency, we would have to take account of the gross premiums." The object of all legislation is to produce as a result the actual commercial solvency of the company. He further states that the one year term plan does not make the policy an unsafe one if the gross premium is large enough to leave a sufficient margin. Is not this a plain recognition of the important part the actual premiums and the expenses play in determining the standing of a company? When these principles were first enunciated the expenses of the first year of a policy were but twice or thrice the expenses of any subsequent year, while it appears that they are now more than ten times as great. Much more, then, ought the principle to be applied in valuing the first year of the policy when the expenses absorb nearly the whole premium. In making the valuation, the rule as claimed by the petitionees is to let the net premium follow the gross premium, and, by the ordinary plan of computing the reserve, the net premium is generally understood to be a uniform percentage of the gross premium. What objection can there be to regarding the amount the company actually receives less commissions as the gross premium and taking a uniform percentage upon that as the net? It is in effect what is contended for by the petitioner and it does not appear that there is any practical objection to it. The question is not one of actuarial science but of legislation. Tell the actuary how to compute the reserve and he will give you the result; but the views of an actuary may be helpful in determining what the construction of a statute shall be, for an actuary

can judge of the result by applying different rules to the same company.    It is well to see what their views are.

Dr. Sprague of Edinburgh, president of the British Inst. of actuaries, the petitionees show "is regarded as the highest living (actuarial) authority," and is so termed by Dr. Mc-Clintock hereafter mentioned, and he says there is nothing unsafe nor unsound in the proposition, i. e., to let "the sum remaining in the company's hands, after the payment of the expenses of the first year and the cost of the insurance, be accumulated as the reserve at that time, * * * * provided the policy holder be made secure by the requirement of a sufficient reserve in the future."

Dr. Emory McClintock, the actuary of the Mutual Life Ins. Co. of New York, which boasts of being the largest financial institution in the world, and who is styled by the witness Wells as "the most prominent and the leading actuary in this country" writes: "If a young company were free to compute its own reserve, and make due publication of the details, it would not impair its security by beginning its reserves on ordinary life policies the second year, or by holding reduced first year reserves on other forms of policies."

The late Mr. Whiting, who was not only an eminent actuary but a lawyer of the clearest judgment, endorsed the same views, i. e., that the principle was sound and legal as well. Mr. Macauley, an eminent actuary and president of the "Actuarial Society of America" says the principle is a sound one and approves of the method; and so does Mr. Wolfe, an actuary employed by various state departments.*    So much for the views of the leading actuaries of the world.

---

* By Chief Judge *Taft*.   Since this opinion was written our attention has been called to an article read on October 25th, 1900, before the Actuarial Society of America by Walter S. Nichols, for many years an editor of the Insurance Monitor, the pioneer and leading insurance journal in America, and since its establishment, editor of the Insurance Law Journal.   Mr. Nichols is an able actuary, one of the old members oᴸ the Actuarial Society, and thoroughly discusses the question from an actuarial and legal standpoint fully vindicating the first year term valuation theory, in the lines indicated herein—save that of public policy.

Such computation is permitted by all our sister states save Massachusetts, and when it is seen that under a different ruling no new company can be organized and do business, nor any small company exist, it is not considered possible that our law-givers ever intended such a construction as that contended for by the petitionees, to be given any statute we have on the subject. It would create such monopolies that modern trusts would blush for their departing laurels. The company has the right to compute its premium reserve in the manner contended for by the petitioner, basing it in effect for the first year upon the amount it receives as premiums, deducting expenses. We have no hesitation in so holding when we fail to find that any claim is made in argument and no reference in the record to the fact that any company ever became insolvent for the reason that its reserve was so computed, and we do not think it possible that this method in the computation of the reserve could ever cause the failure of a company.

An important feature in the consideration of this case is brought to mind by the question asked by the petitionees of the witnesses improved·by them. There were two witnesses only, both actuaries, presumably of high standing, of companies that in amount of assets hold the sixth and seventh rank in the United States. They in effect were asked what was the practical objection to the reserve computation making the first year terminal. Mr. Wells, before referred to, answered that there were two—the first that "the public do not know upon what basis the policies are valued." How forcible is this objection? Do not the public know as much under one system as the other? The actuaries' tables of mortality and the 4 per cent. rate of interest are used in both cases. What the system is that is pursued in the reserve calculation can be required by the department to accompany every statement, so that any person seeing the amount of the reserve could learn at the same time

the system upon which it was calculated. The fact that the public are ignorant of the manner of computing the reserve can never affect the commercial solvency of a company, and besides equities between the insured, to maintain that solvency we consider the main object of state supervision of insurance companies. Mr. Wells' second objection was that while that system of valuation would "increase the surplus which could be used for expenses" the old and large companies, he should expect, would increase their commissions, and so the small companies would be no better off than they are now. This is hardly a practical objection to the plan—a conjecture that a company with a large surplus which belongs to their policy holders would take it and use it for improper purposes, i. e.,— to provide for a reserve on policies of new members, for they could not increase their commissions without doing it. The law presumes that their acts will be legal although the presumption is rather violent in view of the past practices of that kind which enabled them to pay, with their surplus, commissions far in excess of what were legitimate. Mr. Wells concedes the question in issue when he states that the reserve on an ordinary life policy might begin at the end of the third year and the contract be made good—but that the tendency would be unsafe. Case, p. 84. Mr. St. John, actuary of the Ætna, answers at length and says: The practical objection to the first year term form of policy, "depends to some extent as to how you are going to employ it." That it might be admissible for a company in the successful course of business, with a desire for a greater income, "to call a halt" and ascertain what its then existing condition was, and it might be that it was expending in commissions and expenses so much it might assume it was expending all of the first premium and ask: "Let us see where that leads?" Or they might not make any assumption in the matter, but would employ a method of val-

uation that might correspond with the one year term valuation. That in applying it to new companies of unknown standing it ought to be defined by statute what net premiums are, for you may have an indefinite number of net premiums in your gross premium. You must have a statutory standard and adhere to it. If you accept the Englishman's doctrine, that it is every man's business to look after his own business, and not the part of the state to control, you have a different principle. And he concludes by saying he has been informed that in Germany the companies tried and dropped the practice for the alleged reason that it led to an increase of expenses for procuring business. Whether a comparison with the German companies is useful is not clear; the witness stated he did not know what the German laws, nor the provisions of the German insurance contracts, were. Whether the American and German companies are similar or dissimilar does not appear, and a comparison between them, with all knowledge of them nothing but hearsay is not of value. There is not a hint from either of the witnesses of a bona fide practical objection, so far as the commercial or statutory solvency of a company is concerned, to valuing a policy for the first year as a term policy. The last named witness stated that his company, the Ætna, issued a policy for the term of ten years with options on the part of the insured for further terms and for future insurance during life and that the Massachusetts department valued them as term policies until converted into life policies—which was at the option of the insured, the very principle contended for by the petitioner, the only difference in the facts being that the gross premiums in the Ætna were not level.

The petitionees argue that the policies are so framed to avoid and defeat the statute, that it is the avowed purpose on the part of the petitioner to evade the spirit of the law. No doubt the policies were framed with a provision that they

should be valued as term policies for the first year in order to have them so valued; but whether it was to evade the spirit of the statute can be better determined when one knows what the statute requires.    It may have been done to evade an erroneous ruling of an insurance department.    It undoubtedly was to avoid a requirement of holding too heavy a reserve the first year of the policy.    This must be apparent to any one. This plan of valuation is necessary only in case of a new or small company, one that has not accumulated a surplus.    As the witness Wells stated, the plan is followed by "a few comparatively new and comparatively small companies." No company with a surplus needs the plan of valuation and no company without a surplus can compete with one that has. Whether it is in accord with good policy to permit the accumulation of a mammoth surplus is questionable, for the reason that with it a company can enter into undue competition and become heedlessly extravagant in the payment of commissions and salaries and rob one class of policy holders to pay another. A large surplus permits large expenditures and its danger was pointed out by Mr. Wright with a prophetic eye when he wrote nearly forty years since: "The great danger of large expenditures to create business is the establishment of a permanent overpayment of the function of management and the turning loose upon society of that unscrupulous parasitic industry which is content or even ambitious to live upon others without returning any equivalent benefit."    Mass. Ins. Coms. Rep'ts.    1859-65, 333.    That the evils he foresaw followed is plainly seen when the salaries of some of the officials, the result of a mammoth surplus, equal that of the President of the United States.

We say but little as to the effect of the provision in the policy that it may be valued as a term policy the first year— holding that the company have the right to so value it irre-

spective of the agreement—but as Mr. Wright says, the net valuation aims to settle the equities between the old and the new members and as in computing the reserve all above a *quantum sufficit,* a correct amount, belongs to the old members why then cannot a new member consent to such a valuation? And is he not estopped from repudiating the contract in that respect when he has accepted it with such a provision? We hold he is; and note, the policy holder is not the one complaining here.

Take a policy called a preliminary term one. The common sense and the religion of the thing is this: during the first year of the policy it is a term policy, no different from any term policy, it is true at the end of the year the policy holder has a right to renew—so he has under a life policy. If he does not renew the preliminary term policy he has had a term policy for one year,

"Only this and nothing more."

If he does renew, he obtains such rights as he is entitled to under his renewed contract. It is immaterial whether the premium for the first year is the same or more or less than the subsequent premiums. No state has ever attempted to regulate the amount of a premium which should be charged by a company, save indirectly, by requiring the net premium to be sufficient to produce the requisite reserve at the maturity of the policy. To illustrate the effect of the commissioners' ruling, by their plan of computing the reserve, a new company with one million dollars capital stock, issuing the first year policies of a like amount, and saving from the business of the year, only the amount of the reserve calculated upon the first year term basis, is insolvent in the sum of $11,710, although it has more assets than the face of its policies. If this is not *reductio ad absurdum,* pray tell us, what can be.

The term "net valuation" is nowhere used in our statutes, we have no statutory definition of it; the phrase in our law is the "premium reserve" which may be regarded as its synonym, but its generally accepted meaning is that it is the amount the company must have in hand which with its future premiums will enable it to meet its policy obligations.   The statute makes no attempt to regulate the manner in which the net value shall be determined save by requiring the use of the actuaries' tables of mortality, and the 4 per cent. rate of interest.   In determining how much this amount shall be, are the lines so rigidly drawn that no consideration should be given to the expenses of the company, whether they are 10 per cent. of its income or absolutely the whole?   To the fact that the assets produce a 2 per cent. income or a 6 per cent. one, or whether the company have millions of assets which produce no income?   Does the statute intend that these two rules shall be all there is of a valuation?   If so, is an asset like a 2 per cent. or a 4 per cent. Government Bond upon which less than 4 per cent. interest can be realized or millions of non-income-producing property a proper item to be included in the assets?   Are all these considerations to be regulated by the State or left to the management of the company?

The argument that the development of the first year term idea might result in breaking down the statutory valuation system by giving the insurer the power to treat subsequent years of the policy in the same manner, is not sound, for it entirely ignores the element of expenses and the actual or gross premiums, and the time would soon come when the future premiums would not be sufficient to provide for tht reserve, when the gross premium would not equal the mathematical premium. It has been the prevailing custom for the insurance department of every state save Massachusetts to follow the valuation of the state under which a company is organized and this is the spirit

of our law for while the statute gives the commissioners power to compute the "re-insurance reserve" whatever that may be, of a domestic company, V. S. s. 4204, it gives no like power in the case of a company from another state.   V. S. s. 4178. The practice was highly approved of by Mr. Wright and he advocated an arrangement to that effect.   Mass. Ins. Coms. Rep'ts.   1859-65, 170.   Comity between the states has sanctioned the custom for a generation.   It would be an absolute impossibility for the commissioners to do any appreciable part of the valuation of companies doing business in Vermont, but organized under some one of our sister states, for three of such companies each have an insurance of over one thousand million dollars, with an aggregate amount of $5,682,000,000.    It would be like the mouse, not going to the hillock, ·but to the Himalayas.   No state save Massachusetts denies the right to the company of computing its premium reserve as claimed by the petitioner.   The propriety of the right in that state is shown by their legislation when they permit certain assessment companies, upon being converted into old line companies, to so value their policies for a term of 3½ years.   This is enough to show that there is no practical objection to the plan.   Besides equity between the members of a company the reason of the law requiring the accumulation of a premium reserve is for one purpose only and that is to "enable the company to carry out its contracts  *  *  *  *, to be able to fulfill its obligations according to what it has promised," or, as the witness St. John stated it, "that the company shall carry out and perform all its definite obligations."

There is nothing in the case to show or that has any tendency to show that valuing a policy, taking into account the expenses and considering the actual gross premiums, ever affected the standing or solvency of a company in any respect in regard to its ability to carry out its contracts and to fulfill

its financial obligations to the letter.   V. S. s. 4181 provides that: "If the commissioners are satisfied with such copies and statement and that the company has complied with the provisions of the title relating to insurance, they shall grant a license."   This section does not give the commissioners power to arbitrarily refuse the license, but if the copies and statement are in accord with the statute it is their duty to issue a license.   The question is not so much whether the commissioners are satisfied with such copies and statement as it is "ought they to be satisfied with them?"

In the case at bar the only question they make is that the premium reserve was not calculated upon the correct basis and that was the reason why they refused a license, and as they erred in this respect there was no reason why the license should not have been issued, the case showing that with the reserve valued in the manner contended for by the petitioner, the company complied with the statutory requirements in this state. The action of the commissioners was ministerial, not judicial. It is not considered that the commissioners are invested with judicial powers in the examination of foreign insurance companies.   To determine the net reserve of the companies would require a force of actuaries for months, a comparison of the valuation sheets with the policy registers, a clerical force without number, and a valuation of the assets of the companies scattered through many states amounting to some 1,500 millions of dollars, would be required, all to be done within the first three months of the year.   To simply state what would be required of them to judicially determine the reserve and value the assets of the companies, is enough to show the commissioners duties are ministerial, and that nothing else was ever intended by the statute.   Indeed the commissioners do not claim otherwise.   If it were, this court would have no power

to revise their action.    It was the understanding between the
parties that the question should be determined in a legal way.
Their position is shown by their report, 1899 p. 9, when upon
a former ruling they suggested that the company against
whom the ruling was made, "and the Department co-operate
to have the matter tested in the courts."    Upon this point,
however, no question is made by the petitionees.    An instruct-
ive case upon the subject is *State* v. *Doyle,* 40 Wis 175, *q. v.*

The precise question in the case is, has the petitioner the
right to compute its reserve by taking a sum equal to the
reserve on a term policy for the first year?    We hold it has
and that it was entitled to a license, the case showing that their
statement was a full compliance with the statute.    There is
no law in this state relating to the mode of computing the pre-
mium reserve for a foreign life insurance company, save that
it must be based upon the actuaries' tables of mortality and
interest at the rate of four per centum.    There is nothing that
forbids the company taking for the first year's reserve the pre-
mium paid, less the expense of obtaining the policy.    They can
value it as a term policy if they wish, not necessarily because
such is the contract, between the policy holder and the com-
pany but because the company in administering its affairs can
compute the reserve, taking into consideration the expenses of
obtaining the policy in such a way as they deem best to work
justice and equity between the members, provided they do not
disregard the tables of mortality nor the rate of interest.

Taking into consideration the various views presented in
regard to the construction of the statute we are all agreed that
as the words of the statute do not require the construction
contended for by the petitionees, that as such construction
would tend strongly to the creation of monopolies by an abso-
lute prohibition of the establishment of new companies either
stock or mutual, that as there is no practical objection to the

one year term plan which in no event, of itself, would ever affect the actual solvency of a company, and as in the case before us the plan is in harmony with the rights of the policy holders who have consented thereto, we hold that the right claimed by the petitioner is in strict accord with the words and spirit of the statute.

In issuing the first year term policy, with the privilege of taking a whole life policy at the end of the first year there is no violation of V. S. s. 4218, which forbids a company from discriminating between insurants of the same class, in premiums, rates, dividends, or other benefits or terms and conditions. The policy, although it is a term policy, if not renewed, is not in its entirety the equivalent of a simple term policy.

The contracts are not the same and the insured are not of the same class.

The record shows that the petitioner had a surplus of more than one hundred thousand dollars; that its reserve had been computed by the insurance department of its own state in the manner contended for by the petitioner, and as the company had the right to so compute it, its refusal to furnish the reserve upon the basis called for by the respondents was immaterial. The petitioner has no remedy save by mandamus. The petitionees declined to grant a license saying: "We cannot legally do so." There is no way to compel them except to issue the writ as prayed for; it ought not to issue in cases of doubtful right, *Free Press Asso.* v. *Nichols,* 45 Vt. 7, but it always issues if the petitioner has a clear legal right and no other adequate remedy. *Sabine* v. *Rounds,* 50 Vt. 74. A case analogous to this in principle is *Peck* v. *Powell,* 62 Vt. 296. The legal question presented was whether the petitioner was entitled to certain fees as city judge which the petitionee as state auditor refused to allow. This court held that the

petitioner was entitled to them and ordered a mandamus to issue, directing the auditor to allow them.

*The petitioner was entitled to a license... The judgment is that the prayer of the petition is granted, and that a mandamus issue directing the commissioners to grant the petitioner a license as prayed for in the petition, with costs.*