## Joseph D. and Monica H. Corcoran v. Village of Bennington, et al.

[266 A.2d 457]

No. 52-68

Present: **Holden, C.J., Shangraw, Barney, Smith and Keyser, JJ.**

Opinion Filed June 3, 1970

*Dick, Hackel & Hull*, Rutland, for Petitioners.

*Williams, Witten & Carter*, Bennington, for Petitionees.

Barney, J. This is a petition for *mandamus*. The petitioner-plaintiffs seek to compel the defendant village and the associated water, sewer, highway and zoning authorities to issue the necessary permits for water and sewer services to be provided to certain designated lots on property of the plaintiffs in the village that has been subdivided as a mobile home park. Some previous litigation in the chancery court preceded this action. In the present case, after the joining of essential parties (see *Corcoran* v. *Bennington*, 127 Vt. 323, 248 A.2d 730), the factual issues came before a commissioner who made very complete findings of great assistance to this Court. The matter is now here for disposition on those findings, which are not challenged by any party in any way.

The availability of municipal authority to control land use often generates a kind of race for priority. With the prospect of the enactment of a zoning ordinance in view, a landowner may seek to establish a pre-existing use before the statute becomes effective. With the prospect of an unwanted land use developing, municipal authorities may move to enact a zoning ordinance before the activity becomes established as a pre-existing use. Such maneuvers to create or preserve rights relating to the use of property on the eve of the imposition of regulations are probably inevitable, and are not illegal, so long as all acts are done in the proper exercise of lawful authority, and without fraud or misrepresentation.

In this case, the activities of the plaintiffs, beginning in November, 1962, in attempting to establish a mobile home park in the village of Bennington, stirred other residents and the municipal government to action. At that time the village had a

zoning ordinance, enacted in 1956, whose validity had been publicly called into question, but which had not been adjudicated invalid. That ordinance had no mobile home restrictions in it at all until, in March, 1962, it was voted at village meeting to exclude mobile homes and trailers from Residential 1, Residential 2 and Residential 3 areas of the village. The plaintiffs' property was located in a Residential 2 area.

In November, 1962, the plaintiffs entered into a purchase agreement to buy the property they now own. Development operations started immediately. The property was surveyed and subdivided into eighteen lots, and the survey was duly recorded in the office of the clerk of the village of Bennington. The premises were marked with a sign "Mountain View Court", and two mobile home type structures were installed on lots numbered one and two. Grading and levelling was carried out, and arrangements made for gas and electric service for the lots. The business was registered as a mobile home park with the office of the state tax commissioner, and the certificate filed with the village clerk, as required by law. As the findings state: "they did everything that reasonably could be done in establishing the mobile home park without sewer and water service, and they made timely application to the Board of Trustees and to the Board of Water Commissioners for such sewer and water service."

Mr. Corcoran's first application for those services was oral, and made to the superintendent of the water department about the first of December, 1962. The plaintiff was a licensed plumber and had had many such connections made by department employees under the supervision of the superintendent. No written applications or any other village authorities were ever previously involved with respect to water service, sewer service or street excavation, as far as the plaintiff's experience was concerned.

This time things were different. The superintendent advised the plaintiff, Joseph Corcoran, when he made an oral request for connections to service the mobile home park, that he'd better go before the water board and make his application there. The meeting was on December 3, 1962. Corcoran appeared and requested the service. A resident of the neighborhood of the proposed mobile home park attended and protested the development. The board informed Corcoran that a decision would

have to await a judgment by the village trustees as to the acceptance of a proposed street in the development. Ostensibly, this was to provide a right of way for the water and sewer services, but the findings point out that the plaintiffs, as sole owners of the property, had entire capability to provide any necessary rights of way, with or without the acceptance of a street.

The trustees met the following evening, December 4, 1962. A petition, with some one hundred signatures, was presented in opposition to Mountain View Court. The trustees voted to hold a special village meeting on December 18, 1962, "to see if the Village will vote to bar mobile homes, trailers and trailer parks from the residential areas of Bennington."

On December 12, having had no word on his applications, the plaintiff asked the superintendent of the water department if he could install a sewer and water service to one mobile home. The superintendent gave him permission, provided Corcoran could do the work with his own men, since the weather was so cold he would not ask water department personnel to do it. This was agreeable and Corcoran went ahead. During the course of the work the superintendent stopped by and asked Corcoran to go to the clerk's office and fill out an application. He did so, and returned to the job.

As the work advanced, various members of the water board and the village president stopped by the site. No one ordered Corcoran to cease working or disconnect the water and sewer connections he had made. It was remarked that it was not the policy of the village authorities to allow private individuals to make connections to the water and sewer lines.

During the afternoon Corcoran was again called away from the job site to the office of the village clerk, where he was told by some of the board members that he had to have a permit to excavate the street. Those present knew the excavation had been made and the work was well along. This was the first time in his experience that Corcoran had ever been presented with such a requirement. Indeed, there seemed to be no forms available, but Corcoran was shown one which he copied for the purpose of making application. He was then told that action on the application required a meeting of the trustees of the village. He left the application, finished the installation, filled in the excavation, and went home.

The trustees did meet that evening. Faced with public opposition to the Mountain View Court and a vote on the issue of mobile homes in residential areas at the village meeting six days away, they went to the job site at eight o'clock that evening. They re-excavated the street and effected disconnection of the water and sewer lines Corcoran had finished installing a few hours previously. Corcoran was subsequently billed for this operation, and its payment became, understandably, a matter of dispute.

At the special meeting held on December 18, 1962, the village citizens voted "to ban mobile homes, trailers and trailer parks from the residential areas of the Village of Bennington." This was not a new ordinance, but intended as an amendment to the 1956 ordinance, just as was the March, 1962, amendment already noted.

In January, 1963, the contract for the sale of the lands comprising Mountain View Court was executed and the plaintiffs acquired full legal title. In March, 1963, they applied, in writing, for water and sewer connections for seven of the eighteen lots laid out in their mobile home park. A copy of the survey filed with the village clerk accompanied the applications.

These applications came before the meeting of the water commissioners on April 1, 1963, and were tabled. The commissioners, by the record of the meeting, were of the unanimous opinion that the following stipulations would have to be complied with: (1) specify the type of building to be put on the property; (2) pay the outstanding account for disconnecting the water service; (3) obtain permission from the Trustees to excavate in the highway; (4) obtain permission from the town and the State of Vermont Department of Water Resources to connect onto the sewer lines of the village.

The plaintiffs had no notice or knowledge that their applications were to be discussed at that meeting, and were not in attendance or represented there. No notice of the action taken was ever communicated to the plaintiffs, or to anyone on their behalf, in any way. The sewer applications were directed to the board of trustees of the village, and there is no evidence that those applications ever appeared on the agenda of any meeting of that board.

With no action or notice of any decision forthcoming, in May, 1963, the plaintiffs resorted to the court of chancery. They sought an order requiring issuance of the requested permits, and an injunction restraining any action by the Village of Bennington that would control the use or location of mobile homes or limit the establishment or maintenance of a mobile home park on the plaintiffs' land. This action was demurred to, and the contentions advanced by the village that the plaintiffs had an adequate remedy by *mandamus* or under zoning appeal procedures.

At a hearing on May 24, on the temporary injunction, the chairman of the board of water commissioners testified that the written application of March 27 was deficient because it failed to describe the type of building for which the water was to be used. He acknowledged, however, that he had personal knowledge that the plaintiffs proposed to have it service mobile homes.

In their attempts to comply strictly with all of the requirements of the board of water commissioners, the plaintiffs asked for the official application blanks referred to by the chairman of the board on May 24. None were available. The plaintiffs then made copies of the "approved" form and renewed their applications for service as requested on March 27. At the same time a letter was written by their attorney notifying the board in detail of the type of mobile home for which water service was being requested, and reminding them that no notice of any kind was ever given of the action of the board on the March 27 applications, or of any additional requirements or deficiencies relating to them.

The chancellor, on November 18, 1963, without a hearing on the merits, dismissed the chancery action. This dismissal was stated to be without prejudice. No appeal was perfected, since the entry on the dismissal left the way open to institute a new action, and the entry was affirmed in this Court on February 7, 1964, *pro forma*.

On March 17, 1964, the village of Bennington adopted a zoning ordinance, still in effect, which does not permit the maintenance or operation of a mobile home park within the village. Mobile homes, as individual units, are permitted provided that they comply with front, rear and side set-back

requirements and are maintained in a manner consistent with village rules and ordinances as to health and safety.

September 26, 1966, a new chancery complaint was entered, asking that water and sewer connections be authorized. The findings specifically exonerate the plaintiffs from any blame for the delay. The petition also asked that the village of Bennington be ordered to issue the plaintiffs a permit to establish and carry on a mobile home park on their premises, notwithstanding any ordinance that may have been enacted subsequent to their applications for sewer and water service.

The defendants again interposed a *demurrer* and asserted that *mandamus* provided an adequate legal remedy. No evidence was taken at the hearing on the *demurrer* on December 7, 1967, but on February 13, 1968, an order issued sustaining the *demurrer* and dismissing the complaint on the grounds that the issues were *res judicata.*

Later that year the validity of the defendants' position was put to the test when this action for *mandamus* was brought and the matter referred to a commissioner. With this Court now in possession of the necessary facts, through a set of thorough-going findings, and with briefs and oral arguments in hand, the matter is ready for decision.

The defendants oppose the writ at the outset on the grounds that the remedy is available only where the right to be enforced involves a clear-cut legal duty owed to the particular petitioner, and does not involve any element of discretion on the part of the official whose action is being compelled. It is their position that these prerequisites are not present in this case.

It should be kept clearly in mind that it is the decision-making process with which this Court will not interfere by way of *mandamus*. Where it is the duty of an official or a board to determine factual issues which are in conflict, this Court will not pass upon their judgment as to the probative force of the evidence, by any insistence that controverted facts be decided in a particular way. *Sanborn* v. *Weir*, 95 Vt. 1, 5, 112 A. 228. Likewise, where a duty is imposed upon public officials, but discretion accorded in the manner of its performance, *mandamus* will lie to require it to be done, but will not dictate the details of its doing. *Ellis* v. *Cannon*, 113 Vt. 511, 516, 37 A.2d 377.

■ ■ It is also not for this Court to compel action where the direction of the law to the official is merely permissive rather than mandatory. The authority given contemplates a choice by him based on the good-faith exercise of his judgment. *Walsh* v. *Farrington,* 105 Vt. 269, 275, 165 A. 914. The same is true when a privilege, rather than a right is involved, and a discretion is in the authority to grant or not grant the privilege. *Mandamus* cannot there override a valid decision, judiciously made. *Carousel Grill* v. *Liquor Control Board,* 123 Vt. 93, 94, 182 A.2d 336.

■ When the right sought to be enforced becomes certain because the qualifying facts are undisputed or indisputable, *mandamus* will lie to order the result those facts require under the law. *Bankers Life Ins. Co.* v. *Howland,* 73 Vt. 1, 19, 48 A. 435. Nor can an official claim discretionary refuge when the decision-making aspect of his responsibility rests solely on the construction of a statute. *Rutland Cable T.V., Inc.* v. *City of Rutland,* 121 Vt. 399, 403, 159 A.2d 83. *Mandamus* is also a proper remedy in cases of arbitrary abuse of the power legally to be exercised by an official or board that amounts to a refusal to perform their duties. *Proctor* v. *Hufnail,* 111 Vt. 365, 370, 16 A.2d 518. Such a refusal to perform such duties, or to act at all, even if based on an erroneous opinion as to the operation of any statute on the facts of the case, does not alter the situation, and supports resort to *mandamus. Menut & Parks Co.* v. *St. Johnsbury,* 114 Vt. 41, 51, 39 A.2d 342.

■ ■ The search for discretionary aspects sufficient to bar the issuance of a mandate by this Court is unavailing. The need for interpreting any zoning law does not supply it. *Rutland Cable T.V., Inc.* v. *City of Rutland, supra,* 121 Vt. 399, 403. The right of a resident to sewer facilities outreaches a mere privilege and has become a matter of state insistence. See *Kedroff* v. *Town of Springfield,* 127 Vt. 624, 256 A.2d 457. The duty to furnish water, demandable as of right, as an obligation of a water company, subject to such reasonable requirements as those relating to payment and plumbing connections, cannot be seriously disputed. *Waldron* v. *International Water Co.,* 95 Vt. 135, 143, 112 A. 219; see also *McFeeters* v. *Parker,* 113 Vt. 139, 146, 30 A.2d 300.

■ The plaintiffs are entitled to water and sewer services under the same terms and conditions as other comparable applicants. To discriminate is unlawful. *Hall* v. *Swanton,* 113 Vt. 424, 427, 35 A.2d 381. Although conditions may attach to the furnishing of service, they may not be used as excuses to avoid the recognition of a right. The findings, emphasizing the plaintiffs' patient efforts to comply with the continuous and extended elongation of preliminary conditions to the furnishing of service, effectually rebut any claim of the municipality that the refusal of service was substantively based on a failure to carry out the necessary and usual preliminary requirements to the furnishing of such permits.

■ One of the final findings of the commissioner states that the applications of March 27, 1963, have never been either granted or denied, and are still pending. Whether or not it was this situation that the defendants had in mind when they advanced, in opposition to the chancery actions, the proposition that *mandamus* was the proper relief, there is no doubt but what their failure to act on the applications made it an appropriate remedy. *Couture* v. *Selectmen of Berkshire,* 121 Vt. 359, 361, 159 A.2d 78.

It is very plain that the conduct of the various defendants toward the plaintiffs accomplished at least two things, whether or not they were truly objectives of those involved. First, no water and sewer connections were made to the mobile home park. Second, no outright rejection of the plaintiffs' applications was ever made. The findings leave no doubt but that village officials viewed the provision of water and sewer service as an ingredient in the possible establishment of a pre-existing use of the property as a mobile home park, if the zoning ordinance did not take prior effect. The lack of a ruling on the applications obviously gave the village time to enlarge and repair its zoning restrictions. It also appears to have handicapped the plaintiffs in their quest for judicial relief, since there was no ruling from which to appeal.

Taking it all together, a reading of the facts compells the conclusion that the applications for sewer and water services, and the associated permits, were used as instruments to assist in the accomplishment of an ultimate zoning objective, the prevention of the establishment and operation of a mobile home park.

"Municipal licensing authorities cannot unreasonably, arbitrarily or capriciously refuse a license or permit," said this Court, speaking through now Chief Justice Holden in *Rutland Cable T.V.* v. *City of Rutland*, 122 Vt. 162, 167, 166 A.2d 191. In that case, much as in this case, there was a refusal by municipal authorities to act on an application on its merits. If it was done here in the hope of forestalling the establishment of a use long enough to allow passage of a prohibitive act, without other substantive justification, it was arbitrary and capricious. If it was done on the basis that failing to rule on the applications would handicap the plaintiffs' testing of the existing zoning law, it was arbitrary and capricious.

If it was done on the premise that the zoning act then on the books was a justification for refusing the permits until its validity had been judicially tested, the status of that law thereby becomes relevant to these proceedings. We speak of refusal of the permits because it must be said, in view of the evening disconnection of the water and sewer services on December 12, 1963, that whatever the lack in formal action on the applications, the village authorities had no intention then of granting them. The basic reason was clearly revealed in the call for the special meeting and the submission of the article to exclude mobile homes from residential areas. No other substantive basis for their actions is supported by the evidence. Prevention of the operation of the mobile home park was paramount.

Thus, the actions of the defendants can be justified, if at all, only on the basis of support in the zoning law. Whatever its *prima facie* force, its validity has become an issue in this litigation as the justification for the defendants' acts. It was raised in the pleadings, and evidence on the issue put in before the commissioner. The facts in that connection have been found, and are unchallenged.

The suspected vulnerability of the 1954 zoning ordinance is verified by those facts. In 1954 the authorizing statutes governing the adoption of zoning ordinances were V.S. 47 sections 3847–72. In 1958 these became 24 V.S.A. sections 3001–26. They required, among other things, the appointment of a zoning commission in a particular manner, the submission of a preliminary report by that commission, the holding of

public hearings by the commission and the submission of a final report before action can properly be taken by the legislative body looking toward adoption. According to the findings, none of these things were done according to the requirements of the statutes, and some of them, including the holding of public hearings prior to the submission of the final report, were not done at all. Even the publication of the proposed ordinance in the newspaper fell short by two days of meeting the statutory thirty day requirement. The whole process of the purported adoption was irregular, and it cannot qualify as a proper ordinance, since strict compliance with the required procedures is the rule if a municipality is to have the right to exercise zoning authority. *Town of Charlotte* v. *Richter,* 128 Vt. 270, 261 A.2d 29. The two attempted amendments of 1962 fare no better. Amendments, under V.S. 47, sec. 3857 (24 V.S.A. sec. 3011), required public hearings after fifteen days published notice. The facts disclose that no such hearings were held, and, of course, they fail as amendments also because the basic ordinance lacked validity.

Thus, at the time of the plaintiffs' applications for water and sewer connections, there was no effective zoning ordinance. Insofar as the refusal to grant these permits was predicated on the operation of such a law, it is unsupportable, and the permits ought to have been granted.

Some suggestion appears in the defendants' brief that the activity of Corcoran in excavating and making a single water and sewer connection on December 12, 1962, compromises his right to relief. But this will not stand up. He was given permission to do what he did by the very agent of the water board that had directed him to make application when he sought a broader permission. He was in touch with, and in the presence of, the officials of the village and the water board at several times that very day, yet the permission to proceed was never stated to him to be revoked. It is manifestly unfair to charge him with either expense or impropriety arising out of subsequent "second-thoughts" of an officialdom, who must be held responsible for the known acts of their agent, the superintendent.

The plaintiffs, by supplemental petition, filed after argument, have asked to enlarge the relief sought, by requesting

an order requiring the issuance of appropriate water, sewer and building permits for the balance of the lots in the mobile home park upon application, or, alternatively, providing for damages consequent on the defendants' failure to act. Inasmuch as the proposed development of the use of the property, established by the various preparatory actions and the applications for water and sewer service on certain of the lots, predated the ordinance of 1964, a pre-existing use is established to that extent and as to that ordinance. In view of the compulsive nature of *mandamus*, colorfully described in *Rutland Cable T.V., Inc.* v. *City of Rutland, supra,* 121 Vt. 399, 402, 159 A.2d 83, it would be improper to anticipate or prejudge the possible actions of the defendants when confronted by further requests to act from the plaintiffs.

But this circumstance does not, of course, abrogate all rights in the municipality to impose reasonable and relevant conditions of general applicability on the provision of water and sewer service, but as in *Rutland* v. *Keiffer,* 124 Vt. 357, 205 A.2d 400, to legally regulate and license the operation of mobile home parks under 24 V.S.A. sections 2231–33. We will not issue a mandate that would override the exercise of these rights. Nor should we presume on the part of these village officials a failure to honor the lawful rights of the plaintiff as to their property nor should there be presumed a failure by them to perform their municipal duties. The remedy sought ought to be generated by proof of a wrong. Likewise any suit for damages must certainly await a proceeding proving the measure of unlawful injury and loss.

It should be noted that the defendant Town of Bennington, lately joined as a necessary party as the successor in operation of the municipal sewer system to the defendant Village of Bennington, had no part in the matters out of which this litigation arose. The transfer of operations took place January 23, 1968, according to the pleadings. As a consequence, the prayer in the defendant Town of Bennington's answer that they should recover their costs is well-taken, and will be honored.

*Judgment that the prayer for mandamus is granted. Let a mandate issue directing the defendant-petitionees to issue to*

*the plaintiff-petitioners the water, sewer and building permits in order that water and sewer services may be provided, on the usual terms and conditions, to lots 1, 2, 3, 4, 8, 9 and 18 as designated on the survey of plaintiff-petitioners' property, "Mountain View Court", as requested by the plaintiff-petitioners' applications of March 27, 1963. Let the defendant-petitionee Town of Bennington and the plaintiff-petitioners recover their costs from the other defendant-petitionees. The plaintiffs' motion for supplemental relief is denied.*