## THE STATE, EX REL. THE CITY OF BRIDGETON, v. THE BRIDGETON AND MILLVILLE TRACTION COMPANY.

Submitted July 12, 1898—Decided June 21, 1899.

1. A street railway company incorporated under the laws of this state, and the route of its road and the location of its tracks established by an ordinance of the municipality, in the streets of which the company is to operate its road, such ordinance being accepted by such company and its tracks laid in accordance therewith, and the road constructed and in operation, cannot at its mere will and discretion cease and abandon the operation thereof or any portion thereof.   It becomes the duty of the railway company in the exercise of its rights, privileges and franchises for the benefit of the public, to maintain and operate its road according to the terms of the ordinance, and in compliance with statutes which confer upon the company such rights, privileges and franchises.

2. An implied condition attaches itself to the grant of the franchise, that it be held for public benefit, and the duty upon the railway company is to exercise it for such purpose, and as a public agent it cannot escape this duty.

3. The company, duly incorporated, which has the ownership of, and is in possession and control of such street railway, its appliances and property, whether under a lease of or by sale from the original or other company incorporated to construct and operate such railway, or by sale under a decree of the Court of Chancery of this state upon foreclosure, under the statute of this state concerning the sale of the property and franchises of certain corporations (*Pamph. L.* 1897, *ch.* 127, *p.* 229), has conferred upon it all the corporate rights, liberties, privileges and franchises of such original or other company, and upon it rests the same burden and duty to maintain and operate such street railway under the statutes and the ordinances of the municipality as were imposed. upon the original company.

4. The fact that the located route of the railway is laid across a bridge over a stream, the construction, maintenance and control of which bridge is in the board of chosen freeholders, which will not permit the tracks to be laid thereon, unless upon proper and reasonable regulations for the safety of the bridge for the traveling public, furnishes no excuse why the road should not be operated upon its route through the streets of the municipality lying upon either side of such bridge. The acceptance of the ordinance being apart from the control of such bridge by the board of chosen freeholders, and having no relation' to it or to its use, and there being an agreement between the railway company and the chosen freeholders in relation to the use of such bridge,

the court will not enter upon the consideration of the reasons why the company has not performed such agreement, in order to excuse the company from the performance of its duty towards the municipality, in the operation of its road.

5. *Mandamus* is the proper remedy to compel such street railway company to perform the duty of maintaining and operating such railway for the benefit of the public. The public duty imposed upon the company is always active, potential and imperative, and must be executed until lawfully surrendered, suspended or abandoned by the legally expressed consent of the state, and the performance of this duty can be lawfully enforced by *mandamus*.

6. The municipality in the streets of which the railway is located by ordinance, is a proper relator in a proceeding by *mandamus* to enforce the duties of the company towards the public.

On rule to show cause why a peremptory or alternative writ of *mandamus* should not issue.

Before Justices LIPPINCOTT and GUMMERE.

For the relator, *Thomas W. Trenchard* and *Thomas E. French.*

For the respondent, *Walter H. Bacon.*

The opinion of the court was delivered by

LIPPINCOTT, J.   This is a proceeding on a rule to show cause, on the part of the relator, why a writ of *mandamus* should not issue, commanding the Bridgeton and Millville Traction Company forthwith to resume and discharge its duty as a common carrier of passengers, and the exercise of its franchises by operating and continuing to operate, for the transportation of passengers, the street railway, with all necessary turnouts and switches, the tracks of which were located, by ordinance 66 of the city of Bridgeton, the relator, entitled "An ordinance locating the tracks of the railway of the Bridgeton Rapid Transit Company, and authorizing the said company to construct a street railway in certain streets in the city of Bridgeton."

The facts are, that after the incorporation of the Bridgeton

Rapid Transit Company, it presented a petition to the city council of the city of Bridgeton for a grant to locate, construct, operate and maintain a single-track street railway, with the necessary turnouts, in the streets over the route designated in its articles of incorporation, among other streets, "beginning in Summit avenue about one hundred and fifty feet from the westerly line of Atlantic street, in the city of Bridgeton, in the county of Cumberland, in the State of New Jersey; thence along Summit avenue to Atlantic street; thence through and along Atlantic street to Broad street; thence through Broad street and across the bridge over Cohansey creek, through Jefferson street to South Pearl street, through South Pearl street to South avenue and through South avenue to Pamplylia avenue."

On January 31st, 1892, after consideration, the city council passed an ordinance locating the tracks in the streets of Bridgeton, including the streets above named, granting the company the right to operate the line in such streets by any mechanical power except steam, regulating the manner of construction in such streets; that the said railway should be completed within nine months from the acceptance of the ordinance by the company, and providing for the manner in which the streets should be used. In several sections of the ordinance the duties of the company in relation to the use and repair of the streets are defined, certain restrictions imposed, and the rights of the city in the streets expressly reserved. By the twelfth section of the ordinance it is provided in substance that if the company shall fail to run or operate its said cars for the space of five consecutive days, then it shall and may be lawful for the said city council of the city of Bridgeton to order said company to remove its said tracks, wherever it has failed to operate its cars, and unless the company shall forthwith remove the same and place such street or highway in good repair and condition to the satisfaction of the city, then the said city should have power to remove the track, repair the street or highway, and to sell the material removed therefrom, and from the proceeds pay the expense

of removal and sale, paying the surplus, if any, to the company, and in case of deficiency the company to be liable for the same.

On March 1st, 1893, the Bridgeton Rapid Transit Company filed an acceptance of the location of its tracks as designated in this ordinance. On the same day it also filed a general acceptance of the ordinance.

On June 3d, 1893, the Bridgeton Rapid Transit Company leased to the South Jersey Traction Company, a corporation organized for the same purposes as the Bridgeton Rapid Transit Company, the street railway of that company, as located under the ordinance or extended in pursuance of lawful authority then existing, or which might thereafter exist, together with all "the branches, extensions, sidings, turnout tracks, rights of way, lands, machinery, fixtures, depots, stables, shops, stations, buildings, structures, improvements, appurtenances and hereditaments of whatever kind and description and wherever situate," and also "all rights, powers, franchises and privileges," &c., for the term of nine hundred and ninety-nine years. The South Jersey Traction Company, on its part, agreed to assume all "existing contracts relating to the construction and operation of the railway, and agreed to forthwith proceed, at its own cost and expense, to construct, equip and thereafter operate and maintain the whole of the railway not already constructed over and along the streets and highways of the city of Bridgeton, as the route is designated in the articles of the association of the said lessor and as the same has been located by the city council of the city of Bridgeton by the ordinance aforesaid."

The agreement of lease also contained other stipulations that the lessee would exercise all the corporate powers conferred and exercise every right, franchise and privilege in respect to the use, management and maintenance of such railway, and also that during the continuance of this lease the railway should be efficiently operated with a full equipment.

On July 1st, 1893, the South Jersey Traction Company, to secure its bonds, amounting to the sum of $400,000, mortgaged to the Solicitors' Loan and Trust Company nine hun-

dred and ninety-three shares of stock of the Bridgeton Rapid Transit Company and three hundred shares of the capital stock of the Bridgeton and Millville Traction Company, the railway of the South Jersey Traction Company, with all its structures, cars and appliances, and also all the leasehold estate acquired by lease from the Bridgeton Rapid Transit Company, to the South Jersey Traction Company, dated the 23d day of June, 1893.

At the same time of the lease from the Bridgeton Rapid Transit Company to the South Jersey Traction Company, the latter company, by lease, acquired from the Bridgeton and Millville Turnpike Company the rights, franchises and property in certain highways in the city of Bridgeton, of that company, which leasehold estate, with all its appurtenances, rights and franchises, were expressly included in this mortgage.

The mortgage was foreclosed in the Court of Chancery of this state, and by master's deed dated on May 10th, 1897, the shares of stock mortgaged, the railways, rights, franchises, station and equipments of the South Jersey Traction Company were conveyed to one Frank S. Lewis, including the leasehold estate derived from the Bridgeton Rapid Transit Company and the Bridgeton and Millville Turnpike Company.

On May 11th, 1897, the certificate of the organization of the Bridgeton and Millville Traction Company, as a corporation of this state, was filed in the office of the secretary of state, to which corporation Frank S. Lewis immediately conveyed the shares of stock acquired at the foreclosure sale; also all the railways owned by said South Jersey Traction Company, with all cars, shops, stations, &c., and appliances; also all the leasehold estates acquired by the South Jersey Traction Company.

The Bridgeton and Millville Traction Company was organized by virtue of an act entitled "An act concerning the sale of property and franchises of any corporation created by or under any laws of this state except steam railroads, canals, turnpike or plankroad companies," approved April 16th, 1897. *Pamph. L.*, ch. 127, *p.* 229.

It will be seen that the Bridgeton and Millville Traction Company was duly organized under the statutes of this state and became the owner and possessor of all the property and franchises of the Bridgeton Rapid Transit Company, the South Jersey Traction Company and the Bridgeton and Millville Turnpike Company, for the purposes of the operation of this street railway over the streets in question.

By the statute last cited it is provided that "whenever the property and franchises of any corporation * * * shall be sold * * * by any decree of the Court of Chancery, * * * such sale * * * shall vest in the purchaser or purchasers all the right, title, interest, property, possession, claim and demand in law and equity of the parties to the suit or suits, action or actions, in which such decree or decrees was or were made of, in and to the said property so sold with its appurtenances, and also of, in and to the corporate rights, liberties, privileges and franchises of said corporation, but subject to all the conditions, limitations, restrictions and penalties of said corporation, of and concerning the same."

It appears in the case that the street railway has been constructed over the entire route located in the ordinance, and has been operated by these different companies in the order of their possession respectively.

It appears from the facts that in Broad street, and in the route located by the ordinance of the city, there existed a bridge over Cohansey creek, the construction, maintenance and repair whereof was vested in the board of chosen freeholders of the county of Cumberland, and it will be perceived that the ordinance provides for the location of the tracks of the street railway over this bridge as a part of Broad street, as named in the ordinance.

When the operation of the street railway commenced, in 1893 or 1894, the cars ran along Broad street to the easterly side of the bridge and there stopped, and then the operation of their railway was resumed by cars on the west side of the bridge in Broad street; later, rails were laid or located on said bridge and the road was operated and crossed the same on its

tracks. In proof it appears that this bridge had become out of repair or otherwise insufficient to bear the burden of the cars and travel across it by the street railway, and the board of chosen freeholders either erected a new bridge or reconstructed the old one so as to render it of sufficient bearing capacity to accommodate the travel over the same, and upon which new bridge tracks also were laid, and for a time the railway was operated over the bridge on such tracks.

The use of this bridge by the railway company was granted to the company by the board of chosen freeholders by virtue of resolutions granting such permission to use the bridge, and containing conditions for its use, and a formal agreement was entered into between the street railway company and the board of chosen freeholders as to the construction of the tracks across the same, and the manner in which the operation should be conducted, together with regulations as to the location of the motors by which the cars were propelled across the bridge.

The facts show that the street railway company violated the terms of such agreement with the freeholders, whereupon a dispute arose, and after much contention between the company and the board, by direction of the board, the tracks across the bridge were removed, since which time the respondent has abandoned the use of that part of its located route which lies to the west of and over and beyond the bridge over this creek, and has persistently, after demand being made by the city to operate its railway in the streets of its located route lying in that portion of the city of Bridgeton, refused, and still refuses, to operate said portion of said road or to make any attempt or endeavor whatever to do so.

By the act under which these companies are organized, being an act entitled "An act to provide for the incorporation of street railway companies and to regulate the same," approved March 6th, 1886, and the supplements and amendments thereto (*Gen. Stat.*, *p.* 3316), it is provided " that such articles of association shall not be tendered to the secretary of state nor filed or recorded in his office until an affidavit is

made by at least five of the directors mentioned in said articles * * * that it is intended, in good faith, to construct, maintain and operate the road mentioned in such articles, * * * or as its route may be designated by the authorities of the municipalities." In this case such affidavit was made and recorded, along with the certificate of organization, in the office of the secretary of state.

The city of Bridgeton has a population of over thirteen thousand inhabitants. The city is divided by Cohansey creek. On the west side is the Third ward of the city. On the east side are the First, Second and Fourth wards. By the proof it is shown that the part of the route or line of railway in question in this case is almost wholly within the Third ward, and therefore on the west side of this creek; that on this side the city contains a population of about three thousand, and that the end of the located route in that direction is the South Jersey Institute, where several hundred pupils attend school, and that along the located route Atlantic street is built solidly with houses near to, or about to, the end of the route. The proof also shows that the abandoned portion of the route was patronized to a considerable extent during its operation.

The statute places the location of the route of a street railroad in the city council, and the design of the statute, as it appears to me, is that the city shall determine that question which so closely affects public convenience, and it cannot, under any circumstances, be left to the company itself to say what portion of its route shall be operated. The council could not do this, and if it did it would be an unwarranted delegation of authority. *Theberath* v. *Newark,* 28 *Vroom* 309; *Am. St. Ry. Dec.* 133.

It appears by the proof in the case that not only was the route of the company located, but the same was operated upon, by either one or all of these companies respectively, according to its period of occupation and ownership, and that since October 6th, 1897, there has been a complete failure upon the part of any of these companies to perform their duties.

Upon the respondent in this case the burden and duty of the operation of this road rest. It was assumed by the defendant company under the law in the exercise of its rights, privileges and franchise for the benefit of the public, and, therefore, it seems clear that their duty in this respect can be and should be enforced by *mandamus.*

The respondent has the franchise and is under an obligation to perform the duties assumed by the Bridgeton Rapid Transit Company. Its title to its property and franchise is deduced from the Bridgeton Rapid Transit Company by the statute and by its own agreements. It owes the same duty in respect to operation of the railway mentioned in the articles of association of the Bridgeton Rapid Transit Company, as the Bridgeton Rapid Transit Company did originally, if it had constructed and operated the railway. *State* v. *Paterson, Newark and New York Railroad Co.*, 14 *Vroom* 508.

It became the duty of the respondent company to operate the railway over its entire route under the franchises as acquired by it. Its exercise of franchise in the operation of its railway upon this street was exclusive, and it was its duty to construct, maintain and operate a railway on the surface of the street to carry passengers and demand tolls, and that was in so far exclusive that others could not use the road without the grant of the legislature, nor exercise that same or similar franchise upon that street without such grant. *Citizens' Coach Co.* v. *Camden Horse Railroad Co.*, 6 *Stew. Eq.* 267, 279.

In *Messenger et al.* v. *Pennsylvania Railroad Co.*, 7 *Vroom* 407, Chief Justice Beasley, speaking of the duties of a common carrier in a case involving a contract creating illegal preferences, on page 410, says: "A person having a public duty to discharge, is undoubtedly bound to exercise such office for the equal benefit of all." Again, "A company of this kind is invested with important prerogative franchises, among which are the rights to build and use the railway, and to charge and take tolls and fares. These prerogatives are grants from the government, and public utility is the consideration for them." Again he says, "It cannot be supposed that it was the legis-

lative intention, when such privileges were given, that they were. to be used as private property at the discretion of the recipient, but, to the contrary of this, I think an implied condition attaches to such grants, that they are to be held as a *quasi* public trust for the benefit, at least to a considerable degree, of the entire community. In their very nature and constitution, as I view this question, these companies become, in certain aspects, *quasi* public agents."

The grant being exclusive they must be held to a good faith in the performance and fulfillment of their duties. I cannot perceive any excuse whatever by which the respondent company can be permitted to abandon the operation of any part of it. That a portion is unprofitable or· that a portion is more difficult to operate, are not valid reasons for abandonment. Its application to the city was for the location of its tracks over the whole route. The terms and conditions of the ordinance, and the ordinance passed on the faith of the duty of the company, were to operate its road over the entire route located. In view of this ordinance it must be conclusively said that if one part was to be operated and that another part might be abandoned at the discretion of the company, the terms and conditions of the ordinance would have been different. This must be conclusively assumed in a case of this character. It appears clear from the statute and the ordinance that it is the duty of such company organized under the statutes to operate the roads mentioned in its certificate of incorporation for the benefit of the public, in consideration that it shall have the franchise of transporting the passengers and taking the tolls from them, and that it cannot escape the performance of this duty as a public agent.

It also seems clear to me, as against the argument made to the contrary by counsel of the respondent, that *mandamus* is the only and the proper remedy, and that the city of Bridgeton representing the public, for whose benefit the ordinance was passed and the road constructed· and operated, is a proper party as relator. This position seems to be clearly sustained by all of the authorities. *State* v. *Paterson, Newark and*

*New York Railway Co.*, 14 *Vroom* 508, affirmed on the opinion below, 16 *Id.* 186; *New York and Greenwood Lake Railway Co.* v. *Township of Montclair, on appeal*, 2 *Dick. Ch. Rep.* 591; *Wilbur* v. *Trenton Passenger Railway Co.*, 28 *Vroom* 212; *Rex* v. *Severn and Wye Railway Co.*, 2 *Barn. & A.* 646. In the last case Mr. Justice Best said: "But upon principle and authority, I am of opinion that the court ought to grant this *mandamus*. Numerous applications are made to parliament by speculative individuals to form these navigable canals and railways. Great public benefits are held out as inducements to the legislature to sanction these undertakings, and when their sanction is obtained, is it to be permitted to these persons to say that they will only do what is beneficial to themselves and disregard entirely the interest of the public?" See *Talcott* v. *Pine Grove*, 1 *Pyke* 145; 1 *Bench & B. (N. S.)* 50; 19 *Wall.* 666.

In the case of *State* v. *Hartford and New Haven Railroad Co.*, 29 *Conn.* 538, 547, which was on a demurrer to a return to an alternative writ of *mandamus*, the court said: "We prefer to place our decision on the simple ground of the corporate duty of the respondents. All jurists and judges will at once agree that charter parties are obliged fairly and fully to carry out the objects for which they were created, and that they can be compelled by *mandamus* to do so, and it will not be questioned that in the case of public highways, whether turnpikes or railroads, they are bound to keep them fit for use, and in case of railroads to keep them furnished with suitable cars, engines and attendants, without which they cannot be used at all. We advise the issue of a peremptory *mandamus*." The application for *mandamus* in this latter case was to compel the resumption of traffic over a small part of the road abandoned in accordance with an agreement with another railroad company.

In *People* v. *New York Central and Harlem River Railroad Co.*, 28 *Hun* 543, 558, the court said: "The duties imposed must be discharged at any cost. They cannot be laid down or suspended or abandoned without the legally expressed

consent of the state. The trusts are active, potential and imperative and must be executed until lawfully surrendered, otherwise a public highway of great utility is closed or obstructed without any process recognized by law. This is something no public officer charged with the same trusts and duties in regard to other public highways can do without subjecting himself to *mandamus* or indictment." *People* v. *Rome, Watertown and Ogdensburg Railroad Co.,* 28 *Am. & Eng. Ry. Rep.* (*Am. & Eng. Ry. Cas.*) 35; *Chicago, Burlington and Quincy Railroad Co.* v. *State,* 47 *Neb.* 549; *State, ex rel. City of Muncie,* v. *Lake Erie and Western Railroad Co.,* 83 *Fed. Rep.* 284; *State* v. *Minneapolis and St. Louis Railway Co.,* 39 *Minn.* 219; *State, ex rel. Morris,* v. *Hannibal and St. Joseph Railroad Co.,* 86 *Mo.* 13; *State, ex rel. City of New Orleans,* v. *Northeastern Railroad Co.,* 42 *La. Ann.* 11; *People, ex rel. Van Dyke,* v. *Colorado Central Railroad Co.,* 42 *Fed. Rep.* 638.

The only other pretence of excuse for the abandonment or cessation of the operation of this part of the route of its railway by the respondent was that the board of chosen freeholders removed from the bridge in Broad street over Cohansey creek, the rails which were there laid, upon which it operated its road over the bridge.

It is not shown by the proof in this case that the respondent ever attempted in any way to invoke legal proceedings to compel the board of freeholders to replace such rails, or has ever attempted, from the time they were torn up, to replace them.

It does appear very clearly that a contract existed between the board of chosen freeholders and the respondent by which permission was given by the board for the free and full use of this bridge to locate its tracks over which the cars could be operated, qualified with a few simple, plain, natural and reasonable conditions for the preservation of the bridge from danger on account of other public travel, and the dispute between the freeholders and the respondent under this con-

tract seems clearly to have arisen over the location of the motor by which the cars were to be operated over the bridge.

The facts show under this agreement the motor was not to be located on top of the bridge, but either at one side or under it, or in some position where it would not interfere with the public use of the bridge. Upon this point the respondent and the board of chosen freeholders seem to be at opposites, and the board of chosen freeholders, whether rightfully or wrongfully need not be considered, displaced the rails on said bridge in order to prevent the operation of the cars across it.

And it may be remarked that the franchise of this company can be fully exercised in behalf of the public without any reference at all to the location of its tracks upon this bridge. It was once so operated, and it can be again, and, therefore, even if the action of the board of chosen freeholders was legal and prevented the operation of the cars across this bridge upon the rails there located, or if they were illegally displaced by the board of freeholders, this would furnish no excuse whatever for the respondent for the failure to exercise and perform its duties to the public as they can be performed, as fully as they ought to be under the ordinances of the city to be performed.

But it appears from the fact that the rails were removed by the board of freeholders from this bridge through the fault of the respondent in neglecting to keep its contract with the board in respect to the bridge. If the contract had been performed by the respondent company there could have been no legal interference with the location of their tracks across the bridge by the board of chosen freeholders.

The conclusion which the court has reached upon this matter is that this has been made by the respondent a mere excuse for the non-operation of a part of the road which from one reason or another it considers itself entitled to abandon. This cannot be made a legal excuse for such abandonment in any sense. The facts do not bear out the excuse even to any reasonable extent.

The city of Bridgeton does not under the facts, as it appears to the court, seem to be in any laches in this matter whatever.

The rule to show cause in this case must be made absolute, and the writ of peremptory *mandamus* awarded in accordance with it, with costs.