CITY OF BURLINGTON EX REL. BOARD OF SCHOOL COMMISSIONERS
*v.* MAYOR OF CITY OF BURLINGTON.

January Term, 1925.

Present:   WATSON, C. J., POWERS, TAYLOR, SLACK, and BUTLER, JJ.

Opinion filed February 20, 1925.

*Mandamus—When Public Officers May Apply for Writ—Board of City School Commissioners, Having Special Interest, Proper Relators—Mandamus on Relation of City Board May Be Brought in Name of City—Rules Relating to Construction of Deeds—Deed Held to Permit Use of Lot Conveyed, for Purposes of Junior High School—Estoppel —Inadequate Briefing—Admissibility of Letter of Only Lineal Heir of Grantors to Show Attitude on Proposed Use of Property—Language of Deed Construed as Not Meaning Limitation to Erection of But One School Building on Property Conveyed—Power of School Commissioners Under City Charter to Provide for Gymnasium—Application of G. L. 1330—Sufficiency of Information of City Council to Justify Resolution to Construct Junior High School Building and Issue Bonds—Effect of Lots Other Than One Chosen Being Available by City for Erection of School Building—Right of City to Erect School Building for Primary Purpose of Providing for School Children of City Not Affected by Fact That Some Non-resident Students Accommodated—City Council Could Anticipate Future Requirements in Erecting School Building—When Action of School Commissioners and City Council in Providing for New School Building Not Open to Attack—Facts Showing Legal Establishment of Junior High School—Sufficiency of Information Given to*

*Mayor Re Proposed Construction of Junior High School—
Mayor's Discretion Ended after Resolution Passed Over His
Veto—Duty to Sign Bonds Held Ministerial—Right of
Court to Review Mayor's Decision That Bonds Illegal and
to Compel His Signature by Mandamus.*

1. Generally, when a statute imposes a power or duty upon a public officer, or board of officers, and to execute such power or perform such duty it becomes necessary to obtain a writ of mandamus, he, or it, may apply for such writ.

2. A city board of school commissioners, by charter of the city charged with a special duty respecting location and construction of schoolhouses within the city, has, in whatever directly concerns that duty, such special interest as courts will recognize, and as entitles such board to be relator in mandamus to compel mayor to sign bonds duly authorized and prepared, to provide funds for construction of school buildings.

3. Petition for mandamus, on relation of a city board, may be brought in name of city instead of State.

4. The primary rule in construction of deeds is that intention of grantor must be ascertained from the whole instrument construed so as to give meaning and effect to every part of it, if possible.

5. In construing the language of a deed, the situation of the parties, the surrounding circumstances, the subject-matter of the grant, and the object and purpose sought to be accomplished by it, may be considered.

6. Where deed of lot provided that property therein conveyed should be "forever devoted to, and used only for the purpose of public education in the way of a public high school * * * and to uses incidental and auxiliary to the uses aforesaid," use of lot was not thereby limited to such a school as constituted a high school under the statute in force when deed was executed, but might include junior high schools, which, under the present statute, do work otherwise done in first two years of high school and such of the common school work as was required of high schools when deed was made, thereby aiding, helping, and assisting the high schools, and being auxiliary thereto.

7. Only lineal heir of deceased grantors in foregoing deed, *held* estopped from asserting forfeiture of property therein conveyed, because of its use for junior high school, when school

commissioners had informed her of facts and had acted and made expenditures in connection with establishment of such school upon her assurance that such use was within the purpose of grantors.

8. When brief does no more than restate objections made at hearing before commissioners, briefing is too inadequate to require consideration of questions raised.

9. On mandamus to compel mayor to sign bonds to procure money for erection of junior high school building, letter of member of board of school commissioners to only lineal heir of deceased grantors of lot to city for purposes of education, and reply of such heir thereto in effect that use of property for junior high school would be within purpose of grantors, *held* admissible, not for purpose of showing grantors' intention or anything they said or did, but to show attitude of such heir in the matter.

10. Deed of lot to be "forever devoted to, and used only for the purpose of public education in the way of a public high school * * * and to uses incidental and auxiliary to the uses aforesaid," does not mean that only one school building can be erected on such lot.

11. Under charter of city of Burlington, requiring city to provide, equip, and maintain suitable schoolhouses and entrusting such work to the board of school commissioners, subject only, in certain instances, to approval of city council, and placing management and control of all public schools in said board, with authority to make such repairs and additions to existing school buildings as may be necessary; and in view of G. L. 1277, relating to "physical culture," *held* that board of school commissioners and city council acted within authority in providing for a gymnasium in connection with the high school, and on the same lot with it owned by the city, but in a separate building.

12. The provisions of G. L. 1330, as amended by Laws of 1921, Act No. 58, re procuring of land for school purposes, have no application to a lot already owned by a city, but apply only to instances where it is necessary to acquire land from other parties.

13. On mandamus to compel mayor to sign bonds to procure money for erection of junior high school building, *held* that board of aldermen of city when adopting resolutions relating to con-

struction of building and issuance of bonds had sufficient information upon which to act, both as to necessity for building and cost of same.

14. The fact that city had other property than that selected by board of school commissioners for the erection of a junior high school building, which might have been used for that purpose, while for the board's consideration, is not determinative of its action.

15. The primary object of the proper city authorities, in providing for a junior high school building, being to provide suitable and adequate facilities for the school children of the city, for which it was shown there was pressing need, the fact that certain non-resident pupils have been, and are, accommodated in the city schools does not affect such action.

16. In providing for such building, the fact that proposed building was larger than immediate requirements of city did not invalidate action taken, as the city authorities might very properly anticipate future requirements and make provision therefor.

17. Unless it appears that school commissioners and city board of aldermen acted in disregard of and outside the scope of their authority, in providing for a new junior high school building, their action is not open to attack on mandamus to compel mayor to sign bonds to procure funds for construction authorized.

18. When contention was made, in defense of mandamus to compel mayor of city to sign bonds for the purpose of providing funds for construction of junior high school building, that a junior high school had not been legally established in the city, the fact that city with the knowledge and approval of State had maintained such school for a number of years was sufficient to show its establishment, although no formal action to establish such a school in the city was shown.

19. In such proceeding, defense of mayor, claiming Supreme Court to be without jurisdiction, because he had not been given information which board of school commissioners had, *held* without merit.

20. Where charter of city provided that "an ordinance, by-law, resolution or vote," passed over the mayor's veto should be valid and effective "notwithstanding the objection of the mayor," and a resolution authorizing construction of a junior high

school and providing for a bond issue for that purpose was duly passed over his veto, the mayor's discretion in matter ended with his veto, and when authorized bonds were prepared and presented to him for signature, if legally issued, his duty to sign them was merely ministerial, and could be compelled by mandamus.

21. The mayor of city had right to determine whether bonds were legally issued and to decline to sign them if not so issued, but in determining that they were illegal he exercised his judgment and not his discretion, hence on mandamus to compel him to sign such bonds, Supreme Court had power to determine whether he had decided question correctly.

PETITION for writ of mandamus, preferred to the Supreme Court for Chittenden County, at its November Term, 1924, and heard at its January Term, 1925, on the pleadings, and evidence taken pursuant to an order for that purpose. *Writ issued.*

*Theodore E. Hopkins* and *Warren R. Austin* for relators.

*Hamilton S. Peck* and *S. Hollister Jackson* for the respondent.

SLACK, J.    This is a petition for a writ of mandamus brought by the city of Burlington on the relation of its board of school commissioners, Fred E. Kimball, Clarence H. Beecher, Edward Lavallee, John R. Kelly, Jesse R. Rust, and Henry H. Hagar, against the respondent J. Holmes Jackson to compel him, in his capacity as mayor of said city, to sign certain school bonds hereinafter referred to. The case is here on the pleadings and evidence taken pursuant to an order for that purpose.

Most of the questions of law presented for consideration grow out of the facts admitted by the pleadings which are in effect these: The above named persons are the duly elected school commissioners and mayor, respectively, of the city of Burlington. The charter of the city provides:

Sec. 164.    It shall be the duty of said city to provide, equip and maintain suitable schoolhouses for the accommodation of all the public schools of, or required by, said city.

Sec. 165.    The location and construction of the schoolhouses, and the management, sale and purchase of school property shall

be under the control of the school commissioners, subject to the limitations herein provided, and the limitation upon their power of incurring liabilities in behalf of said city.

Sec. 166.   Before the school commissioners shall purchase any real estate for school purposes, or enter into any contract for the construction of any school building, other than repairs of and additions to existing school buildings deemed necessary by said school commissioners, they shall file with the clerk of the city council a statement showing the necessity of such purchase of real estate, or of the construction of said building, together with an estimate of the cost of such real estate, or of the construction of such building, and the amount of money necessary for such repairs.

Sec. 167.   They shall not purchase any real estate, nor enter into any contract for the construction of any school building, until such action has been approved, and the funds for the same provided, by the city council.

Sec. 168.   Upon the approval by the city council of such proposed purchase of real estate for school purposes, or such proposed construction of a school building, said city council shall provide the necessary money for such purpose by levying a tax sufficient to meet the whole or any part of the expense of such purchase or construction provided that the sum raised by taxation in any one year for school purposes, including such purchase of real estate or construction of a school building, shall not exceed the limit hereinbefore prescribed; or the city council may pledge the credit of said city to meet the whole or any part of such expense by issuing notes or bonds, to be known as school bonds.

Sec. 169.   Such notes or bonds shall be issued in denominations of not less than one hundred dollars, nor more than one thousand dollars each, and shall be payable in not less than one nor more than thirty years from the date of their issue; and shall contain a statement that they are issued for the purpose therein mentioned and in conformity to the provisions of this. act; and they shall be signed by the mayor and countersigned by the treasurer of said city.   If interest coupons are attached thereto, they shall be signed by the treasurer.

The city is the owner of a tract of land situate on the south side of Main Street and east side of South Union Street in said city whereon the Edmunds High School Building, so called, stands, which was conveyed to it by the late George F. Edmunds and his wife, Susan M., by deed of warranty dated March 12, 1898.   The habendum, and other material parts of said deed are

as follows: "To have and to hold the above granted and bargained premises with all the privileges and appurtenances thereto belonging unto the City of Burlington and its lawful municipal governmental successors, forever devoted to, and used only for the purpose of public education in the way of a public high school, and at the pleasure of the City and its said successors, a public free library, and antiquarian and historical collections, and to uses incidental and auxiliary to the uses aforesaid. And if any part of the property above described shall be at any time hereafter devoted to or used for any other purpose or purposes than those above mentioned, then, in that case, the title to and absolute ownership of said described property and every part thereof shall thereupon at once revert to the said Edmunds and his heirs and assigns as of his former right."

The board of school commissioners as early, at least, as September 2, 1922, had under consideration the necessity for, and location and construction of, a junior high school building, gymnasium, and assembly hall; and various phases of this matter, not necessary to be noticed here, were before the board at meetings thereof held between the date above mentioned and January 25, 1924. On the latter date, at a meeting of that board at which all members were present, it was voted to provide for a balcony in the auditorium of the Edmunds High School building and a junior high school building and gymnasium, in separate buildings, on the Edmunds lot east of the present high school building, and to request the architect to prepare plans therefor. At a meeting of said board, held February 1, 1924, it was voted to adopt the plans for a junior high school building, gymnasium, and alterations to the assembly hall of the Edmunds High School building prepared by its architect, and to request the city council at its next regular meeting for an appropriation of $350,000 for such constructions and alterations, and a statement then and there formulated setting forth in detail the necessity for the proposed constructions and alterations, and the estimated costs of same, to wit: $350,000, together with an application to the city council for an appropriation of that amount for said purposes was adopted by said board without a dissenting vote; and said statement and application was filed with the clerk of the city council on February 4, 1924. At a meeting of the board of aldermen of said city, who with the mayor constitute the city council, held February 18, 1924, a resolution was adopted ap-

proving "said vote and action of said school commissioners for a new school building and gymnasium on the south side of Main Street east of the Edmunds High School building for use as a public school in said city and for the proposed alterations to the Edmunds High School, and the estimated costs thereof," and for the purpose of providing the means to do such work, said board then and there adopted the following resolution: "Resolved by the Board of Aldermen of the City of Burlington that the said city of Burlington will, and it hereby does, pledge the credit of said city in the sum of three hundred fifty thousand dollars by the issuance of its negotiable notes or bonds to the amount of said three hundred fifty thousand dollars in accordance with the provisions of the city charter of said Burlington relating thereto; (then follow provisions relating to the denomination, time of payment, signing, etc., not material here) and that the fund realized therefrom to the amount of three hundred fifty thousand dollars be placed to the credit of said school commissioners to be used for the purpose of the construction of said school buildings," etc.

These resolutions were presented to the mayor for his action thereon, and were vetoed by him. At the next regular meeting thereafter of said board of aldermen, held on March 3, 1924, said resolutions were re-adopted and passed over the mayor's veto. Thereafterwards, to wit, on or about July 1, 1924, bonds to the amount of $350,000 were prepared in conformity with the aforesaid resolutions, and all details necessary for the issuance and sale or conversion of the same into money, except the signing thereof by the mayor, were fully done and performed. Since that time said bonds have been and still are in the custody of the city treasurer and accessible to the mayor for his signature, and although requested by the board of school commissioners from time to time to sign the same he has wholly refused and still refuses so to do.

The right of the relator to the relief prayed for is challenged on several general grounds which are in effect as follows: (1) That the school commissioners have not such an interest in the subject-matter of the petition as entitles them to act respecting the same; (2) That the city is not a proper party to institute these proceedings; (3) That the Edmunds lot is not legally available for the proposed uses; (4) That the board of school commissioners have no authority to build a gymnasium as pro-

posed, either on the Edmunds lot or elsewhere; (5) That the steps other than the mayor's signature, necessary to the validity of the proposed bonds, have not been taken; (6) The mayor had discretionary power, even after his veto of the resolutions, to refuse to sign said bonds. These questions are considered in their order.

[1, 2] (1) Generally speaking, when a statute imposes a power or duty upon a public officer, or board of officers, and to execute such power or perform such duty it becomes necessary to obtain a writ of mandamus, he, or it, may apply for the same. This doctrine is stated thus in *State ex rel. Board of Education v. Cavendish,* 81 W. Va. 266, 94 S. E. 149: "The right of said board of education, as relator, to maintain this proceeding is challenged by demurrer to the alternative writ, but concerning such right there is no doubt. It is well established by the decisions of this court and the highest courts of other states, that public officers, or boards of officers, may maintain proceedings in mandamus to compel other officers to perform ministerial acts, which come within the scope of their supervision or which are necessary to be performed in order to enable such officer or board to perform its duties." To the same effect are *State ex rel. Village of Chisholm et al.* v. *Trask,* 155 Minn. 213, 193 N. W. 121; *Sinclair* v. *Mayor of Fall River,* 198 Mass. 248, 84 N. E. 453; *Pearsons* v. *Ranlett,* 110 Mass. 118; *Cole* v. *State,* 131 Ind. 591, 31 N. E. 458; *State* v. *Bronson,* 115 Mo. 271, 21 S. W. 1125; *State ex rel. Wayne County Court* v. *Herrald, Commissioner,* 36 W. Va. 721, 15 S. E. 974; *Holland* v. *State,* 23 Fla. 123, 1 So. 521; *State* v. *Ulson,* 30 S. D. 460, 139 N. W. 109; *State ex rel. Bridgeton* v. *Bridgeton & M. Traction Co.,* 62 N. J. Law, 592, 43 Atl. 715, 45 L. R. A. 837.

We have seen that by the terms of the city charter the board of school commissioners is charged with a special duty respecting the location and construction of schoolhouses within the city; and, in whatever directly concerns that duty, it has, in the strictest sense a special interest, which the courts will recognize.

[3] (2) It is urged that the petition is fatally defective because brought in the name of the city instead of in the name of the State; and attention is called to the fact that the common law requirement in this respect is not changed by the provisions of Chapter 111 of the General Laws. Mandamus has almost, if not quite, lost its character as a prerogative writ, and has come

to be regarded rather as a writ of right, demandable in a civil action whenever it is an appropriate remedy. And while, "a remnant of the ancient distinction enjoyed by the writ of mandamus is, however, still often found in the style or name of the proceedings" (18 R. C. L. 322), it has never been deemed essential in this jurisdiction that the proceedings be brought in the name of the State, whether such proceedings were instituted by a private party, a public officer, board of officers, or a municipality. This is illustrated by the following cases: *Bankers' Life Ins. Co.* v. *Howland et al.*, 73 Vt. 1, 48 Atl. 435; *Clement* v. *Graham*, 78 Vt. 290, 63 Atl. 146, Ann. Cas. 1913E, 1208; *Hartness* v. *Black*, 95 Vt. 190, 114 Atl. 44; *Grout* v. *Gates*, 97 Vt. 434, 124 Atl. 76; *Town of Salisbury* v. *Button et al.*, 97 Vt. 9, 112 Atl. 435; *City of Burlington* v. *Burlington Traction Co.*, 98 Vt. 24, 124 Atl. 857; *Town of West Rutland* v. *Rutland Ry. L. & P. Co.*, 98 Vt. 508, 129 Atl. 303. See, also, *Sinclair* v. *Mayor of Fall River, supra,* where a petition for mandamus brought by the board of aldermen against the mayor, treasurer, and auditor of the city was sustained; and *Pearsons* v. *Ranlett, supra,* where a like petition brought by the board of water commissioners for the town of Holyoke against the treasurer of said town was upheld. Nor is it apparent why the city to which, as we have seen, certain powers and duties have been delegated by the State, may not have recourse to this remedy, in its own name, against one who prevents the execution of such powers or the performance of such duties, in the manner here shown, even though such one be the mayor himself.

[4, 5] (3) Although the right of the city to use the Edmunds lot for the purposes contemplated does not, in the circumstances disclosed, depend upon the meaning and effect of the Edmunds deed, it is deemed advisable to consider that question. The primary rule that obtains in the construction of deeds is that the intention of the grantor must be ascertained from the whole instrument construed so as to give meaning and effect to every part of it, if possible. *DeGoosh* v. *Baldwin & Russ,* 85 Vt. 312, 32 Atl. 182. And in construing the language of a deed, the situation of the parties, the surrounding circumstances, the subject-matter of the grant, and the object and purpose sought to be accomplished by it, may be considered. *Crosby* v. *Montgomery,* 38 Vt. 238.

[6] The respondent contends that applying these rules to

the deed before us, it must be held that the grantors intended that the property conveyed should be used only for such a school as constituted a high school under the statute in force when the deed was executed (V. S. 700), and intended that such school should be housed in a single building. We cannot accept this conclusion. In our judgment it does violence to the real purpose and intention of the grantors. Mr. Edmunds was one of the ablest lawyers of his generation, a fact to which respondent calls attention, and presumably knew that the schools of the State were under legislative control, and subject, in all respects, to such changes as the Legislature might, from time to time, see fit to make. That he intended to provide for a school that should keep pace with the times, and conform to legislative requirements, without danger of losing its existence altogether, cannot be doubted. Moreover, the deed does not limit the use of the property strictly to high school purposes as such schools were then, or might thereafter be, constituted. The language of the deed is: "Forever devoted to, and used only for the purpose of public education in the way of a public high school." The words, "and to uses incidental and auxiliary to the uses aforesaid" will be presumed to have been used for a purpose, and must be given meaning and effect accordingly. And the only purpose for which they could have been used must have been, as the language indicates, to enlarge upon and broaden the uses already enumerated. That the grantors had in mind a junior high school cannot be claimed. But that they did have in mind a school in which instruction should be given in the common school subjects, or at least some of them, may be presumed, for such was, in effect, the requirement of V. S. 700. That statute provided that the high schools there defined should give instruction in certain specified higher branches "in addition to the branches of learning taught in the common schools." This clearly indicates that the work of such schools was not confined to instruction in the higher branches, but included, as well, instruction in common school, or grade, studies, within reasonable limits.

The junior high schools, as constituted under our present school system, have a four years course of study (G. L. 1292), the first two of which are designed to cover the work done in the seventh and eighth grades of the elementary schools under the old system (G. L. 1276, 1294), and the last two of which

may, if prescribed by the State board of education, cover the precise work done in the first two years of the regular high school (G. L. 1277). Thus it will be seen that such schools not only do the work otherwise done in the first two years of the high school, but also do such of the common school work as was required of high schools in Mr. Edmunds' day. And in doing such work, they are aiding, helping, and assisting the high schools, and are therefore auxiliary to such schools, in the strictest sense. See Webster's New Int. Dict.

[7]    But there is another reason why the city may use the Edmunds lot for the purposes contemplated without forfeiting its title thereto.

It appears from the undisputed evidence that both grantors in the Edmunds deed have deceased; that they left only one lineal heir, a daughter, who resides in California; that she was sole legatee under the will of Mr. Edmunds, who survived his wife; that in February, 1923, a member of the board of school commissioners, acting for the board, wrote the daughter stating, in effect, the nature of a junior high school, that the city desired to erect a building for the accommodation of such a school on the lot conveyed to it by her parents, that the mayor, and others, questioned the legal right to do so, and requesting that she give a waiver of any rights she might have under the deed; that she replied to this letter under date of February 20, 1923, declining to give a waiver, but therein stating among other things:

"I am glad to do all in my power to clear away any confusion or misunderstanding of the terms of my Father's and Mother's deed of gift of our old home property in the City of Burlington. As I knew every step of the consideration of the question at the time the gift was decided upon and made, I have no difficulty whatever in removing, as I hope, any doubt as to the legality of putting any sort of building for educational purposes upon the property. * * * The purpose of the condition was that the entire property should never be used for any other than public educational work of some sort, * * * I know that neither he (father) nor my mother had the slightest desire to control the special form or work and use of the place, but wished to make clear their meaning, in the words 'public education.' They wished it to be clearly understood, however, that no portion of the property should ever be rented or sold or used for other than educational purposes by the city. * * * Of course

I am no judge of the situation as regards the necessity of additional school buildings in that part of Burlington, but your reasons for wishing for them seem to me excellent.    The High School is such an unusually beautiful building, and all its surroundings seemed to me so perfectly well kept and suitable that I should hope all further buildings could be made subordinate to it;"

and that the action of the board of school commissioners in voting to locate the junior high school building on the Edmunds lot was "very largely" influenced by said letter, and that expenditures for architect's plans, etc., amounting to nearly three thousand dollars, had been made in reliance thereon.

In these circumstances, there can be no doubt but that the daughter, who, as we have seen, is the only person entitled to assert a forfeiture if the proposed acts are carried out, would be estopped from so doing. *Locklin* v. *Davis,* 71 Vt. 321, 45 Atl. 224; *Valiquette* v. *Clark Bros. Coal Mining Co.,* 83 Vt. 538, 77 Atl. 869, 34 L. R. A. (N. S.) 440, 138 A. S. R. 1104.

In this connection it may be proper to call attention to another fact which, because not deemed necessary, is not considered in disposing of these proceedings, namely, that since this petition was brought the daughter of Mr. and Mrs. Edmunds has executed and delivered to the city, and its successors and assigns, a quit-claim deed of all right and title she may now, or hereafter, have "to forefeiture and reverter" because of the use of the Edmunds lot for a junior high school building; the "intent and purpose" of such deed, as declared by the terms thereof, being "to remove any question of the right of the city of Burlington to use said property for the purpose of a junior high school."

[8]    The admission of the copy of the Edmunds' will which shows the daughter to have been sole legatee thereunder was objected to on eleven different grounds.    Regarding the questions thereby saved the respondent's brief does no more than to restate, in effect, the objections made before the commissioner. This is too inadequate briefing to require an examination of the questions.    *In re Chisholm's Will,* 93 Vt. 453, 108 Atl. 393; *Burlington Grocery Co.* v. *Lines et al.,* 96 Vt. 405, 120 Atl. 169; *McAllister* v. *Benjamin,* 96 Vt. 475, 121 Atl. 263.

[9]    The two letters above referred to were admitted subject to the objection that they were immaterial, incompetent, etc.

We think they were admissible, not for the purpose of showing the grantors' intention or anything they said or did, but for the purpose of showing the daughter's attitude in the matter; and they are considered for no other purpose.

[10]    The claim that only one school building can be erected on this lot is without merit.

[11, 12]    (4)    We think the board of school commissioners and city council acted well within their authority respecting the gymnasium.    By section 164 of the charter, the city is required "to provide, equip and maintain suitable schoolhouses." This work is entrusted to the board of school commissioners subject only, in certain instances, to the approval of the city council. Section 165 *et seq.*    The desirability, not to say necessity, of physical training in the secondary schools has been recognized by our legislators.    G. L. 1277 places "physical culture" in the same category with ancient and modern languages, political science, etc.    Section 157 of the charter places the "management and control" of all the public schools of the city in the board of school commissioners; and by the same section and section 166 they are given authority to make such repairs and additions to existing school buildings as may be deemed necessary.    It is thus clear that they had authority to establish a course in physical culture, and to provide suitable accommodations therefor by way of repairs or additions to existing buildings.    And we think it equally clear that, with the approval of the city council, they might provide the necessary accommodations in a building constructed for that purpose; and this, too, without a vote of the city if such building is erected on land owned by the city, and available for that purpose.    The provisions of G. L. 1330, as amended by Act No. 58, Laws 1921, apply only to instances where it is necessary to acquire land from other parties.    That the Edmunds lot is available for a gymnasium cannot be doubted.    If a gymnasium could be provided in the present building, as unquestionably it might, no reason exists why it may not be provided in a separate building.

In support of the fifth ground upon which the relator's right to mandamus is challenged, it is urged that:    (a) When the board of aldermen adopted the resolutions relating to the construction of said buildings and the issuance of said bonds, it did not have sufficient information upon which to act, either as to necessity for such buildings or the cost of same; (b) a

junior high school was not then legally established in said city; (c) the city had no legal right to construct a gymnasium, and if it had, the necessary steps to obtain the city's consent thereto had not been taken; (d) the information upon which the board of school commissioners acted was not furnished the mayor to enable him to pass upon the resolution authorizing said bonds; and (e) the Edmunds lot is not available for a gymnasium.

[13] Concerning the first of these propositions, it is manifest from its action in respect thereto that the board of aldermen had what it deemed sufficient information both as to the necessity for the proposed buildings and the cost thereof. If such information as it had can fairly be said to have justified its actions, the fact that the mayor or somebody else would have required other or different information is wholly beside the question. Without going into a lengthy discussion of what the record shows in this respect, it may safely be asserted that enough appears to justify and sustain the action of the board. It had as a basis for its action the statement filed with the clerk of the city council by the board of school commissioners, on February 4, 1924, and the plans therein referred to which showed the number and arrangement of rooms in the proposed junior high school building, the gymnasium, and the changes in the Edmunds High School building, and the evidence shows that it made such investigation concerning material to be used, details, etc., that it cannot be fairly claimed that it acted ignorantly or arbitrarily.

[14] While the fact that other property of the city might have been used for the accommodation of the junior high school was for the consideration of the board, it was by no means determinative of its action.

[15, 16] Nor does the fact that certain non-resident pupils have been, and are, accommodated in the schools of the city, affect the action of the board. The primary object was to provide suitable and adequate facilities for the school children of the city, for which the record shows a pressing need existed, and the fact that the proposed building is larger than the immediate requirements of the city for its own children, does not invalidate the action of the board. It might, very properly, anticipate future requirements and make provision therefor.

[17] These were all matters for the consideration of the school commissioners and aldermen, and unless made to appear,

as it is not, that they acted in disregard of and outside the scope of their authority, their action is not open to attack in these proceedings.

[18]    (b)    While it did not appear that formal action had been taken to establish a junior high school in the city of Burlington, it appeared, without dispute, that the city with the knowledge and approval of the State has maintained such a school ever since 1915.    This was enough.

(c)    This is disposed of by what has already been said.

[19]    (d)    The respondent insists that the bonds in question are invalid, and that this Court is without jurisdiction in these proceedings, because he was not given the information which the board of school commissioners had regarding the necessity for the proposed buildings, the kind of material to be used, the provisions made for fire protection and sanitation, etc.    It is not claimed but that he had such information concerning these matters as was to be derived from the statement and accompanying plans filed with the city council by the school commissioners, and it does not appear but that he could have had all the information the latter possessed had he desired it.    Moreover, it is not claimed, anywhere, that he would have acted differently if he had had all the information which he later acquired.

The only matter specifically complained of is the failure of the secretary of the State Board of Health to furnish respondent, upon his request, a copy of two letters, one written by the board of school commissioners to the local board of health, August 4, 1924, asking permission to use the school building at the corner of College and Willard Streets for junior high school purposes until the close of the school year in 1925, and the other a reply thereto by the State Board of Health under date of August 18, 1924, granting such permission. which he claims he was entitled to in determining the necessity for the proposed buildings before signing said bonds.    It will be seen that this correspondence did not take place until long after the respondent had vetoed the resolution in question, the same. had been passed over his veto, the bonds prepared in accordance therewith, and he had been given ample opportunity to sign them.    Moreover, he saw the letter written by the school commissioners to the local board of health soon after it was written, and took no steps to acquaint himself with the reply thereto for more than a month. We think the claim wholly without merit.

(e)    This is already disposed of.

[20]    (6)    No question is made but that the resolutions authorizing the proposed constructions and providing for the bond issue followed the course prescribed by the city charter, namely, they were adopted by the board of aldermen, vetoed by the mayor, and reconsidered and passed over his veto by the requisite vote.    But it is urged that even so, the respondent in the exercise of his discretionary power could refuse to sign such bonds.    Section 46 of the charter provides that ''an ordinance, by-law, resolution or vote'' passed over the mayor's veto shall be valid and effective ''notwithstanding the objection of the mayor.''    In view of this provision, there can be no doubt but that the mayor's discretion in the matter ended with his veto. When the authorized bonds were prepared and presented to him for his signature, if they were legally issued, it was his duty, both by the terms of the resolution and the provisions of the city charter (Section 169), to sign them.    This, being a duty in which nothing is left to discretion, is purely ministerial (*Grout v. Gates, supra,* at page 450; *State ex rel. Village of Chisholm v. Trask, supra,* and cases there cited), and being such may be compelled by mandamus.    *Clement* v. *Graham, supra; Sinclair v. Mayor of Fall River, supra; United States* v. *Black,* 128 U. S. 40, 32 L. ed. 354, 9 Sup. Ct. 12; *Marbury* v. *Madison,* 1 Cranch (5 U. S.) 137, 2 L. ed. 60, and cases cited above.

[21]    That the mayor had the right to determine whether the bonds were legally issued, and if not decline to sign them, cannot be doubted.·    But in determining this question he exercised his judgment, and not his discretion, in the sense in which that word is used when coercive action by mandamus is resisted. Whether he determined the question correctly is for this Court to decide; and we are satisfied that he did not.

It is not necessary to consider in detail other questions discussed in the elaborate briefs of counsel, since those already noticed are determinative of the case.

We entertain no doubt as to the duty of the respondent, as mayor of the city of Burlington, to sign the bonds in question, or that such duty may be enforced by mandamus, and judgment is rendered accordingly.

*Judgment that a mandamus issue directed to the said J. Holmes Jackson, as mayor of the city of Burlington, com-*

*manding him to forthwith sign the bonds in question in his official capacity as such mayor, in due form, in the place indicated on such bonds as prepared for such signing, in accordance with the terms of the resolution providing for such bonds; and, thereupon, to proceed, in co-operation with the treasurer of the city, to sell said bonds in accordance with the terms of the resolution relating thereto. Let the petitioner recover its costs. Let this mandate become effective at once. Let a certified copy hereof be forthwith served on the respondent.*